IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GARY T. PHILLIPS

      v.                      :    Civil Action No. DKC 13-1965

NLYTE SOFTWARE AMERICAS LIMITED

## MEMORANDUM OPINION

Presently pending and ready for resolution in this employment contract case are a motion for summary judgment filed by Defendant Nlyte Software Americas Limited ("Nlyte" or "Defendant") (ECF No. 30) and motion for leave to file a surreply filed by Plaintiff Gary Phillips ("Plaintiff" or "Mr. Phillips"). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion for summary judgment will be granted. Plaintiff's motion for leave to file a surreply will be denied.

## I. Background

### A. Factual Background

Unless otherwise noted, the following facts are undisputed. This case involves a dispute over a commission. Nlyte is a leading producer of data center infrastructure management software, which allows businesses strategically to manage their information technology assets. (ECF No. 30-4 ¶ 2). In July

2012, Nlyte hired Plaintiff to work as a Regional Sales
Director, Mid-Atlantic Region, with an August 13, 2012 start
date. (ECF No. 30-9, at 2, offer letter to Gary Phillips).
Plaintiff negotiated his employment with Steve Tsuchiyama,
Nlyte's then Vice President, Worldwide Field Operations. (ECF
No. 30-8, at 21). The offer letter stated that Plaintiff's
responsibilities included:

> To support the general sales and
> professional services operations and effort
> of the Company. Responsibilities will
> include but not be limited to the sales of
> software and professional services, and the
> ongoing support and satisfaction of existing
> customers. Subject to change, you will be
> measured quarterly on sales contribution and
> achievement of assigned quotas. Management
> will determine specific duties.

(*Id.*). Plaintiff's base salary was $2,307.69 per week ($120,000
on an annual basis). The offer letter further stated that
Plaintiff would be eligible to participate in Nlyte's sales
commission plan, "which will payout an additional $120,000.00 on
an annualized basis at plan." With respect to commissions, the
offer letter stated:

> All target commission will be based upon the
> achievement of specific targets referenced
> under the commission plan. Details of your
> annual commission and bonus plan will be
> provided to you under separate cover.

(*Id.* at 2-3). Plaintiff was provided with a "Fiscal Year 2013
Direct Sales Compensation Plan," (hereinafter, "compensation

2

plan"), which he signed on July 30, 2012. (ECF No. 30-11). The plan states, that "[i]n addition to your basic annual salary, and in order to incentivize you, you will receive additional payments in accordance with the terms of this letter, which shall be subject to tax deductions."[1] (*Id.* at 2).

Bank of America, an existing client of Nlyte's, was one of the accounts in Plaintiff's territory. Plaintiff was told to focus on the Bank of America account because there was an opportunity for an expanded relationship, and that "[i]t was a dormant account [] that was not being actively worked." (ECF No. 30-8, at 26). In the Fall of 2012, Plaintiff helped develop a sales proposal for Bank of America. Nlyte held a meeting with Bank of America in October 2012, proposing two options: a license capacity expansion and a software upgrade. (*Id.* at 30).

Niraj Desai is the Vice President of Field Engineering for Nlyte, in which capacity he is responsible for the technology-side of the interaction with Nlyte's customers. (ECF No. 30-7, at 3). He stated in his deposition that he prepared a PowerPoint presentation that was presented to Bank of America at a meeting in October 2012. (*Id.* at 4). Included in the PowerPoint presentation was a slide showing a summary of how its

---

[1] As relevant here, the terms of the compensation plan will be set forth in the analysis section below.

software could interface with IT service delivery (also known as IT service management ("ITSM")).  (*Id.* at 6).  Mr. Desai stated:

> the reason this slide was put in here was because at the time [] *Bank of America was looking to acquire BMC products that are in the slide and as part of that, we wanted to show value that if they went to the BMC products*, there is a value between BMC products and the NLYTE products.

(*Id.* at 6) (emphasis added).  BMC is a business partner of Nlyte's.  (ECF No. 30-5, at 6).  The proposal from Nlyte in October 2012 did not involve BMC or Nlyte's ITSM connectors, however.

Bank of America passed on the software upgrade in 2012 and focused exclusively on the license capacity expansion.  For the 2012 license capacity proposal, Plaintiff was negotiating pricing terms with a procurement officer at Bank of America. Ultimately, Bank of America informed Nlyte that it did not have the budget to move forward with the license capacity expansion, (ECF No. 30-5, at 7), but Plaintiff was instructed to follow up with Bank of America in early 2013.

In January 2013, John Beischer began work as the Executive Vice President of Worldwide Sales and Support for Nlyte.[2]  (ECF No. 30-5, at 3).  Mr. Beischer served as Plaintiff's supervisor at that point.  (ECF No. 30-8, at 8).  In late January 2013,

---

[2] Mr. Beischer succeeded Steve Tsuchiyama in that role. (ECF No. 30-5, at 10).  Mr. Beischer previously served as a consultant with Nlyte.

John Beischer, Sandra Denton,[3] and Niraj Desai were meeting with representatives of BMC at BMC's New York offices. (ECF No. 30-5, at 6). Defendant contends that coincidentally, representatives from Bank of America also were meeting with BMC that same day. (*Id.*). Nlyte representatives and Bank of America representatives met together at BMC's offices, to begin to explore the possibility of including Nlyte software in a larger software purchase that Bank of America was exploring with BMC. Through a business partner agreement, BMC sells a version of Nlyte software called BMC Nlyte Enterprise. (*Id.* at 8).

In February 2013, BMC and Nlyte presented a proposal to Bank of America. (*Id.* at 12). Mr. Beischer and Ms. Denton were the primary employees at Nlyte who were responsible for driving a potential deal with Bank of America. On February 28, 2013, Plaintiff received an email from Ms. Denton, asking him to forward certain documents to Nlyte's contacts at BMC, a description of Nlyte's Predict and Dashboard modules, as well as a solutions brief. (See ECF No. 30-12, at 3). Plaintiff forwarded the email to Brad Pomerantz, an employee in Nlyte's customer satisfaction department, and then to Matt Bushell, Senior Product & Corporate Marketing Manager with Nlyte. (*Id.*

---

[3] Sandra Denton is the Vice President of Alliances and Channels at Nlyte, in which capacity she drives indirect sales of the company. (ECF No. 30-6, at 4). She is tasked with recruiting and "enabling third parties to [resell] our product to the customer." (*Id.*).

at 2-3). Matt Bushell then sent certain documents to BMC, despite Ms. Denton's instruction that the documents be sent by Plaintiff. The email to BMC included an "analytics data sheet," instead of the "solution brief." (ECF No. 30-6, at 7). Ms. Denton testified during her deposition that this oversight elongated the sales cycle by a couple of days. (*Id.* at 8).

Later that day, Mr. Beischer sent the following email to Plaintiff:

> Unless otherwise instructed, only Sandra and myself are to communicate with BMC or BoA. Only those two people, that is it. Matt is NEVER to send a customer ANYTHING. Gary, you have the potential to cash a huge check, do not blow it, go to the movies, watch TV, but do not do anything else on BoA unless asked. Sandy or I communicate, you take instructions from Sandra or I.

(ECF No. 30-13, at 2) (emphasis in original). Plaintiff responded with: "[u]nderstood, my error. I apologize for the mistake." (ECF No. 30-14, at 2).

The Bank of America/BMC Deal closed in March 2013 for approximately $2.4 million. (ECF No. 30-4 ¶ 3 & ECF No. 30-10, at 6). The parties disagree over Plaintiff's level of involvement with the Bank of America/BMC Deal and his influence on the deal. Mr. Beischer believed that Plaintiff's behavior with respect to the Bank of America/BMC Deal "was not very professional." (ECF No. 30-5, at 16). When asked during his

deposition what Plaintiff should have been doing, Mr. Beischer responded:

> Well, he should have been preparing the proposals. He should have been preparing the Power Points. He should have [received] this information from Matt Bushell and put it in his own Bank of America specific type document to send it to BMC, not just pass along a generic document. That is lazy. So he was not taking the initiative. He was not putting in the necessary effort into a deal of this magnitude.

(*Id.* at 17). According to Mr. Beischer, Plaintiff also was "not aware of every step because he was not listening when we were on the conference calls, in particular the ones with BMC. He was not auditing the proposals. He was not making the proposals look nice. . . . He was not keeping in touch with the customer to ensure everything was on track. Getting their feedback, what I would call the behind the scenes feedback from the customer." (*Id.* at 18).

Plaintiff tells a different story. Although he concedes that Sandra Denton and John Beischer drove the Bank of America/BMC Deal, he states that he did not negotiate the terms of that deal because he was expressly told to "stand down" by his supervisor, Mr. Beischer. (ECF No. 30-8, at 68). He states, however, that "there was some input that [he] had that was part of the terms that were ultimately negotiated." (*Id.*). Owen Nisbett, the Chief Financial Officer of Nlyte, declares

that "[t]he deal that closed in March 2013 between BMC, Nlyte[,] and Bank of America was more than twice the revenue to Nlyte than a prior software upgrade and license capacity proposal that Nlyte had made to Bank of America directly in the Fall of 2012 (which did not involve BMC)."  (ECF No. 30-4 ¶ 4).

After the Bank of America/BMC Deal closed, Plaintiff sent an email to Mr. Beischer on March 30, 2013:

> I did get the word late yesterday from Niraj.  He said that our contract was signed with BMC and sent to Owen for our signature, but that we were waiting for BMC to finalize their deal with BoA. . . .  Also John, I had been standing down on your instructions, but I wanted to thank you now that it is official.  I know you have your "process and strategy" of closing out deals and also I was advised by Niraj to lay low.  So I just wanted to, again say, thank you for all the work, time and business savvy that you put into this deal to bring it across the goal line.

(ECF No. 30-15, at 2).  Plaintiff ultimately received a commission of approximately $57,606.13 for the Bank of America/BMC Deal.  (ECF No. 33-2 ¶ 59).  When Mr. Beischer informed Plaintiff about his commission, Plaintiff stated that he did not think it was a fair amount.  (ECF No. 30-8, at 60-61).  Plaintiff believes that he should have received commission on the full value of any deal that closed within his territory, regardless of the work he put into the deal.  He believes that he should have received commissions totaling $247,457.99.  (ECF

No. 33-2 ¶ 59).   On May 7, 2013, Nlyte terminated Plaintiff's employment.

### B.   Procedural Background

On June 7, 2013, Plaintiff filed a complaint against Nlyte in the Circuit Court for Montgomery County, Maryland.   (ECF No. 2).   Defendant filed a notice of removal on July 8, 2013, citing diversity jurisdiction as the jurisdictional basis.   (ECF No. 1).   Plaintiff asserted three causes of action in the complaint: (1) breach of contract related to Defendant's failure to pay him commission on the Bank of America/BMC Deal; (2) violation of the Maryland Wage Payment and Collection Act, Md. Code. Ann., Lab. & Empl. §§ 3-501 et seq. ("MWPCL"); and (3) second breach of contract for other commissions that Nlyte allegedly failed to pay him.   (ECF No. 2).   After completing discovery, Defendant moved for summary judgment on March 7, 2014.   (ECF No. 30). Plaintiff opposed the motion (ECF No. 33), and Defendant replied (ECF No. 35).   Plaintiff then moved for leave to file a surreply, and attached a proposed surreply to the motion.   (ECF No. 35).

## II.   Analysis

### A.   Defendant's Motion for Summary Judgment

### 1.   Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving

party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment. *Celotex,* 477 U.S. at 322–23.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

## 2. Breach of Contract

Plaintiff believes that Nlyte is liable for breach of contract because he is owed more commission than he was paid on the Bank of America/BMC Deal.[4] Plaintiff asserts that he is

---

[4] In his opposition to Defendant's motion for summary judgment, Plaintiff asserts that he is seeking damages arising

entitled to a commission of $247,457.99, and that he was paid only $57,606.13.  (ECF No. 33-1, at 5).

"Whether an employee has earned a commission depends on the terms of employment." *Hoffeld v. Shepherd*, 176 Md.App. 183, 200 (2007).  Terms governing payment of commissions may be a matter of "agreement in advance of the employment or to become a part of the undertaking during the employment." *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 305 (2001).  Here, the terms governing payment of commission were referenced in the offer letter to Plaintiff and further set forth in the compensation plan.  In Maryland, to succeed on a breach of contract claim, a plaintiff must prove that the opposing party owed a contractual obligation and breached that obligation. *Taylor v. NationsBank*, N.A., 365 Md. 166 (2001).  Under Maryland law, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetary Co.*, 434 Md. 37, 51 (2013) (*quoting Tomran, Inc. v. Passano*, 391 Md. 1, 13 (2006)).  To determine the parties' intentions, courts first look to the written language of the contract.  *Id.*  "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV,*

---

only out of the Bank of America deal, and "consents to entry of summary judgment with respect to Count III."  (ECF No. 33, at 1 n.1).

*Inc. v. Mattingly*, 376 Md. 302, 313 (2003) (*quoting Wells v. Chevy Chase Bank*, F.S.B., 363 Md. 232, 251 (2001)).

When a contract's language is clear and unambiguous, "its construction is for the court to determine." *Wells*, 363 Md. at 251. "A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean." *Adams v. Wells Fargo Advisors, LLC*, Civ. Action No. ELH-12-2130, 2014 WL 2124447, at *12 (D.Md. May 21, 2014). Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 623 (2006).

A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167 (2003). To determine whether a contract is ambiguous, the court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985). "If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Cnty. Commissioners*

*of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445 (2001).   "'If, however, resort to extrinsic evidence leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'"   *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F.Supp.2d 511, 526 (D.Md. 2012) (*quoting Wash. Metro Area Transit. Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007)).

The parties agree that the offer letter and compensation plan govern the terms by which Plaintiff earned commission. (*See* ECF No. 30-10, at 4).   On July 30, 2012, Plaintiff signed the offer letter to join Nlyte, which states, in relevant part:

> Commission:  In addition to your annual salary you will be eligible to participate in the Company's sales commission plan, which will payout an additional $120,000.00 on an annualized basis at plan. *All target commission will be based upon the achievement of specific targets referenced under the commission plan.*
>
> Details of your annual commission and bonus plan will be provided to you under separate cover.

(ECF No. 30-9, at 2-3) (emphasis added).   Plaintiff also executed a "Fiscal Year 2013 Direct Sales Compensation Plan."[5] (ECF No. 33-9).   The compensation plan assigned specific quotas

---

[5] The document includes an August 2012 date on the top right hand corner, but the date next to Plaintiff's signature is July 30, 2012.  (*See* ECF No. 33-9).

that Plaintiff should reach to attain 100% quota achievement in Fiscal Year 2013:

> 1) Quotas – for Fiscal Year 2013, quotas are assigned as follows:
>
> · License/First Year Maintenance (L/FYM) - $1,770,000
> · Professional Services (PS) - $300,000

(*Id.*).[6]  The commission plan states that "[c]ommission earned through the sales of L/FYM and PS is calculated using the table below":

| 2013 COMPENSATION PLAN SUMMARY- Full Year | | | 2013 COMPENSATION PLAN SUMMARY- Prorated | |
|---|---|---|---|---|
| 12 Month Quote | $1,770,000 | | 10.5 Month Pro-Rated Quota | $1,548,750 |
| 12 Month Base Salary | $120,000 | | Prorated Base Salary | $105,000 |
| Commission @ 100% | $125,000 | | Prorated Commission @ 100% | $109,375 |
| Base Commission Rate | 7.06% | | Base Commission Rate | 7.06% |
| 2013 Compensation @ 100% of Plan | $245,000 | | 2013 Compensation @ 100% of Prorated Plan | $214,375 |

| L/FYM Quota Achievement Tiers | 50% | 80% | 100% | 150% | 200% | 300% | 400% |
|---|---|---|---|---|---|---|---|
| Quota Achievement | $774,375 | $1,239,000 | $1,548,750 | $2,323,125 | $3,097,500 | $4,646,250 | $6,195,000 |
| Commission Rate | 5% | 8% | 11% | 15% | 15% | 15% | 15% |
| Total Commission | $38,719 | $37,170 | $34,073 | $116,156 | $116,156 | $232,313 | $232,313 |
| **Accumulated Commission** | **$38,719** | **$109,961** | **$109,961** | **$226,118** | **$342,274** | **$574,586** | **$806,899** |
| **Case Compensation Total** | **$158,719** | **$229,961** | **$229,961** | **$346,118** | **$426,274** | **$694,586** | **$926,899** |

| Professional Services Achievement Tiers | 50% | 80% | 100% | 150% | 200% | 300% | 400% |
|---|---|---|---|---|---|---|---|
| Annual Quota  $300,000 | | | | | | | |
| Quota Achievement | $150,000 | $240,000 | $300,000 | $450,000 | $600,000 | $900,000 | $1,200,000 |
| Commission Rate | 1.5% | 1.5% | 1.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Total Commission | $2,250 | $1,350 | $900 | $3,750 | $3,750 | $7,500 | $7,500 |
| **Accumulated Commission** | **$2,250** | **$3,600** | **$4,500** | **$8,250** | **$12,000** | **$19,500** | **$27,000** |

As relevant here, the commission plan also contains the following provision in Paragraph 5:

> Bookings Credit and Commission Split Policy – Bookings and commission splits will be determined by level of effort, salesperson

---

[6] Plaintiff's quota achievement was prorated for a 10.5 month term as set forth in the table below. (*See* ECF No. 33-9, at 2 ("This plan represents a prorated quota for Fiscal Year 2013.")).

> and/or account team influence on deal,
> account control and location, technical
> validation event time, impact effort, and
> the location of the aforementioned.

(ECF No. 30-11 ¶ 5).  The commission plan defines "bookings" as "the amounts received by Nlyte net of discounts, 3rd party license, service and support fees, and 3rd party commissions and bonuses."  (*Id.* ¶ 4).  In terms of payment policy, the compensation plan provides: "[l]icense and first year maintenance commission is payable 50% on bookings with the balance paid on receipt of funds from the customer.  Professional Services commission is payable 50% on delivery with the balance paid on receipt of funds from the customer."  (*Id.* ¶ 6).  Finally, the commission plan states that "[t]he Worldwide Vice President of Field Operations or his designate is solely responsible for the plan interpretation where not clear or covered in the plan."  (*Id.* ¶ 7).  Steve Tsuchiyama signed the commission plan on behalf of Nlyte, and at the time, he served as Vice President, Worldwide Field Operations.  John Beischer – who became Plaintiff's supervisor in January 2013 – succeeded Mr. Tsuchiyama in that role.

Nlyte argues that Plaintiff's claim that he is owed additional commission on the Bank of America/BMC Deal fails because it runs contrary to terms of his compensation plan. (ECF No. 30-1, at 9).  Defendant believes that the compensation

16

plan is unambiguous and that "Nlyte retained the discretion
under the Plan to adjust the bookings credited to Plaintiff on
any given deal based on the 'level of effort, salesperson and/or
account influence on the deal,' and other factors." (*Id.* at 10-
11).  Nlyte contends that the compensation plan defined as
bookings revenue from a deal on which Plaintiff's performance
would be measured using the factors in Paragraph 5 of the plan;
according to Nlyte, "the Plan expressly provided that 'bookings'
could be adjusted to account for Plaintiff's 'level of effort,'
among other factors." (ECF No. 34, at 8).  According to Nlyte,
under the terms of the compensation plan, it had the ability to
credit toward quota achievement and payment of commission less
than the full amount that Nlyte may recognize for revenue
purposes, adjusting the figure to be credited for quota
achievement purposes using the criteria in Paragraph 5.  Nlyte
avers that "[t]he table simply set forth Plaintiff's commission
entitlement at various levels of target achievement.  It did not
set forth -- indeed, it begged the question of -- how to
determine whether and when Plaintiff satisfied certain levels of
target achievement." (*Id.*).

Plaintiff, on the other hand, argues that the compensation
plan is ambiguous and subject to multiple interpretations.
Plaintiff reads the compensation plan as predicating commissions
on "sales," not "bookings," and not depending on whether the

employee originated or closed the deal or whether the sale was "direct" or "indirect." (ECF No. 33-1, at 23). Plaintiff believes that "[t]he fair and reasonable reading of the contract as a whole would lead the reasonably prudent person to believe that entitlement to commissions were based upon sales, and that this was what [Plaintiff] agreed to." (*Id.*). Plaintiff references language in Paragraph 2 of the compensation plan immediately preceding the tables, which states that "[c]ommission earned *through the sales* of L/FYM and PS is calculated using the table below." (ECF No. 30-11 ¶ 2). Plaintiff's reading of the compensation plan is that regardless of how much work he put into any deal, his commission would be calculated based on the total amount collected by Nlyte on any given deal. (*See* ECF No. 33-1, at 22 ("Considered as a whole, the Court must conclude that the percentage figures and the table was included to detail the amounts that Phillips <u>would</u> receive upon meeting specific achievement targets, because that was the only way that the parties intended to determine the amount that Phillips would be paid." (emphasis in original))).

Nlyte's interpretation is correct. First, the compensation plan is labeled "Fiscal Year 2013 *Direct Sales* Compensation Plan" and defines the terms of Nlyte's *direct sales* compensation plan for a fixed period. (*See* ECF No. 30-11) (emphasis added). The document further explains that it "defines [Nlyte's] *Direct*

*Sales* Compensation Plan for the period 13 August, 2012 through 30, June, 2013.  This plan represents a prorated quota for Fiscal Year 2013." (*Id.* at 2) (emphasis added).  Plaintiff worked in "direct sales" at Nlyte.  Sandra Denton, who worked on the Bank of America/BMC Deal along with John Beischer, testified during her deposition that at Nlyte, there was a distinction between direct sales people and indirect sales people in that "direct sales sells directly to the client and indirect sales sells through the partner to the clients." (ECF No. 30-6, at 6).  It is undisputed that the Bank of America/BMC Deal was an indirect sale.  Plaintiff testified that the October 2012 proposal to Bank of America *would have been* a direct sale, whereas the 2013 Bank of America/BMC deal was an indirect sale for Nlyte:

> Q: Okay.  And you would agree with me that the 2013 deal was an indirect sales deal for Nlyte whereas the –
>
> A: Yes.
>
> Q: -- the 2012 proposal would have been direct for Nlyte with Bank of America?
>
> A: Correct.

(ECF No. 30-8, at 36-37).

Nlyte correctly argues that it "reserved for itself the sole discretion to interpret the terms of the Plan. [] Therefore, by operation of the Plan, it was for Nlyte to

determine what level of commission Plaintiff was to be paid on the Bank of America/BMC Deal." (ECF No. 30-1, at 10). Paragraph 7 of the compensation plan allocates to the Worldwide Vice President of Field Operation or his designate sole responsibility for interpreting the plan *where not clear or covered in the plan*. (*See* ECF No. 30-11 ¶ 7). Indirect sales – such as the Bank of America/BMC Deal on which Plaintiff believes he is owed more commission – are not covered by the compensation plan. Thus, John Beischer had discretion to determine appropriate compensation for Plaintiff considering that Plaintiff had worked on the Bank of America account, but the proposal that materialized into a deal was an indirect sale not covered by the compensation plan.

Specifically, James Nisbett, Nlyte's CFO, testified during his deposition that John Beischer, Doug Sabella,[7] and Mr. Nisbett met to discuss how much Plaintiff should be paid in commission for the closing of the Bank of America deal:

> Q: Why did you have that discussion?
>
> A: We felt that we wanted to treat Gary fairly *even though someone could argue that he wasn't due any commission*. But as I said, we wanted to treat him fairly.
>
> . . .
>
> Q: Was it just the one discussion with the three of you?

---

[7] Doug Sabella is the President of Nlyte.

> A: Initially, yes, and then there are a
> number of emails following up that
> conversation.

(ECF No. 30-10, at 3). Based on the evidence on the record, the commission that Nlyte ultimately paid Plaintiff was calculated on projected revenue from the October 2012 proposal to Bank of America on which Plaintiff worked, which was an attempt at a direct sale, but that never materialized into a deal. Mr. Beischer testified that in calculating Plaintiff's commission, he focused on the Bank of America transaction that Plaintiff assisted with in October 2012 "as a benchmark to what we felt might be fair compensation for Gary for the Bank of America transaction." (ECF No. 30-5, at 20). Mr. Beischer provided the following explanation as how Plaintiff's commission was determined:

> Q: Why is it that you focused on that
> proposal that existed in the earlier time
> frame?
>
> A: Because we are using it as a bench mark
> to what we felt might be fair compensation
> for Gary for the Bank of America
> transaction.
>
> Q: Why do you say that?
>
> A: Because that is the deal that Gary was
> pursuing in the previous quarter. We were
> trying to determine what the valve of his
> effort was on the deal. *Given that his
> effort was minimal on the March deal, we
> said let's just take a look [and] see what
> was being proposed in the previous quarter.*

> *And understand what the commission pay out*
> *would have been had that deal closed.*

(ECF No. 30-5, at 20) (emphasis added).   Email correspondence

reflects that Mr. Nisbett figured that Plaintiff's compensation

should be tied to the revenue Nlyte could have obtained if the

October 2012 proposal materialized into a deal:

> I don't think we can go with an estimate and
> *need to tie his commission with what was*
> *originally put to BoA*. . . . I have
> calculated the following:
>
> License Fee: $807,104
> FYM: 145,279
> Total: $952,383.
>
> This works out to be $53,557 in commission
> due to Gary.

(*Id.* at 2).   Mr. Beischer further explained the rationale behind

calculating Plaintiff's compensation during his deposition:

> Essentially what [Mr. Nisbett] is saying,
> let's pay Gary what he would have earned had
> his deal from the previous quarter closed.
> That would have been [$]807,000 worth of
> software,   first   year   maintenance   of
> [$]145,000.   There   are   different   rates
> between   software   and   maintenance.   So
> applying the calculations it is $53,000. . .
> . [W]e thought that was fair.  This is what
> Gary   proposed,   he   didn't   win   the   deal.
> *However had he won the deal, this is what*
> *his commission would have been.*

(ECF No. 30-5, at 22) (emphasis added).   The compensation plan

did not give Plaintiff a vested right to *any* set commission on

an   indirect   sale,   but   reserved   for   Nlyte   the   ability   to

determine   appropriate   compensation   under   circumstances   like

22

Plaintiff's, which were not covered in the plan.[8]  Instead of not paying Plaintiff any commission in connection with the Bank of America/BMC Deal, Nlyte calculated Plaintiff's commission on revenue that Nlyte *could have* realized had the October 2012 direct sale proposal materialized into a deal.

Plaintiff stated in his deposition that: "according to my compensation plan [], it was my belief that I would be fully credited for any deals that were brought into the company as a result of whether – *if they were direct, indirect deal[,] that I*

---

[8] Plaintiff argues that Paragraph 7 "makes meaningless Nlyte's promise to pay Phillips commissions based upon a specific mathematical calculation[] and the achievement of specific targets." (ECF No. 33-1, at 25).  He further contends that as a matter of public policy, Paragraph 7 is void and should be disregarded, but the only support he cites for this proposition is that courts interpret contractual ambiguity against the drafter.  (*Id.* at 27).  Both arguments are unavailing.  Paragraph 7 does not create any inconsistency with the other provisions in the compensation plan.  Paragraph 7 – which empowers Nlyte to interpret the plan - is triggered in situations like Plaintiff's, where *not* covered or clear in the plan.  As explained above, the Bank of America/BMC Deal was an indirect sale not covered by the express terms of the compensation plan, and thus any commission to be earned by Plaintiff on that transaction fell within Nlyte's discretion to determine.  (*See* ECF No. 34, at 7 ("[E]ven if there were ambiguities in certain parts of the Plan with regard to how Plaintiff's commission on the Bank of America/BMC Deal was to be calculated, Nlyte had the authority under the Plan to resolve those ambiguities, which it did in calculating Plaintiff's commission for the deal.")).

*would be fully compensated.*   That was my understanding."[9]   (ECF No. 30-8, at 61) (emphasis added).   Plaintiff appears to interpret the plan as giving him "full credit" on all sales that occurred in his territory.   Plaintiff stated that based on his *offer letter*, he believed that if he "met [his] target quota[,] [he] would receive on target earnings of another $120,000 on top of [his] base salary."   (ECF No. 30-8, at 15).   The offer letter also explicitly stated, however, that "[d]etails of your annual commission and bonus plan will be provided to you under separate cover."   (ECF No. 30-9) (emphasis added).   Plaintiff testified during his deposition:

> A: . . . it was my understanding that if I
> brought a deal into the company that was in
> my territory I would get full credit.   That
> was my understanding.
>
> Q: Regardless of how much work you did on
> that deal?
>
> A: Whether I did one thing or a hundred
> things it was my interpretation that I would
> get full credit.

---

[9] Plaintiff also testified, however, that he did *not* read the compensation plan before he signed it:

> I didn't really read this document [the
> compensation plan]. [] *I mean I didn't
> really pay much attention to this document*
> because, again, I was really basing my
> decision on my employment with the company
> with this offer letter.

(ECF No. 30-8, at 20) (emphasis added).   Plaintiff stated that he did not remember reviewing the compensation plan "other than just signing it."   (*Id.* at 16).

(ECF No. 30-8, at 63).   Mr. Nisbett explained during his deposition that the Bank of America/BMC Deal was for approximately $2.4 million, but Nlyte recognized $1,793,279 in revenue for license fees and $42,090 as first-year maintenance. (ECF No. 30-10, at 10).   Under Plaintiff's interpretation, the full sale amount of any deal for license/first year maintenance and/or professional services would be counted toward quota achievement, provided the deal involved a customer in Plaintiff's Mid-Atlantic Region and irrespective of how much work he put into the deal.

Plaintiff's interpretation ignores Paragraphs 4 and 5 of the compensation plan, however.   The compensation plan defines bookings as revenue received by Nlyte after deducting third party license fees, service and support fees, and third party commissions and bonuses.   Paragraph 5 covers "bookings credit and commission split policy," and *allows* Nlyte to consider the salesperson's level of effort, influence on deal and other factors in determining how much of the revenue received by Nlyte will be credited toward the salesperson's quota achievement. Here, Plaintiff's own testimony confirms that Sandra Denton and John Beischer primarily drove the Bank of America/BMC Deal, thus triggering the commission split provision.   (*See* ECF No. 30-8, at 8).   Defendant correctly asserts that "[b]y the plain terms

of the Plan, the bookings on which Plaintiff's commission were
to be based were not an absolute number of any particular
'sale,' [] but rather were subject to adjustment by Nlyte based
on several factors." (ECF No. 34, at 6). Indeed, Plaintiff
acknowledged in his deposition that the compensation plan
provides that "bookings [and commission splits] will be
determined by level of effort and several other factors," but
stated that he "didn't really pay much attention to this
document" because he primarily relied on the offer letter to
govern the compensation terms of his employment. (ECF No. 30-8,
at 20). The plain terms of the compensation plan belie
Plaintiff's interpretation of how commission would be determined
in circumstances such as here, where the indirect sale to Bank
of America fell outside the type of "direct sale" deals covered
by the plan. As Defendant argues, "Plaintiff cannot subvert the
unambiguous terms of the Plan by substituting his own,
subjective opinion as to what he thought the Plan meant,
particularly where his subjective opinion is directly contrary
to the plain terms of the Plan." (ECF No. 30-1, at 11).

Based on the foregoing, Plaintiff cannot establish that
Nlyte breached his contract by failing to pay appropriate
commission on the Bank of America/BMC Deal, and summary judgment
will be granted to Defendant. Because Plaintiff has not
established that Nlyte wrongfully withheld any "wages" from him

26

in the form of a commission, summary judgment on the MWPCL claim in count II also will be granted to Defendant.

### B. Motion for Leave to File a Surreply

After Defendant's motion for summary judgment was fully briefed, Plaintiff moved for leave to file a surreply and included a proposed surreply. (ECF No. 35). Local Rule 105.2.a states: "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." The court may permit a surreply when a party would not otherwise have an opportunity to respond to arguments raised for the first time in the opposing party reply. *See Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003). Defendant did not raise any new issues or legal arguments in the reply brief to which Plaintiff needs to respond in his surreply. Indeed, Plaintiff acknowledges that the purpose of the surreply is to "assist the Court in deciding Defendant's [m]otion for [s]ummary [j]udgment." (ECF No. 35, at 1). In his proposed surreply, Plaintiff seeks once more merely to contest the basis for Defendant's motion for summary judgment and reiterates arguments he already made in his opposition brief. Therefore, the motion for leave to file a surreply will be denied.

### III. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant will be granted. The motion for leave to

file a surreply filed by Plaintiff will be denied.  A separate

order will follow.


                                                 /s/
                                      DEBORAH K. CHASANOW
                                      United States District Judge